**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

GREENWICH INDUSTRIES, L.P.,           )
                                      )
          Plaintiff,                  )
                                      )
          v.                          )     No. 07 C 6550
                                      )
LEGGETT & PLATT, INC.,                )
                                      )
          Defendant.                  )

## <u>MEMORANDUM OPINION</u>

Before the court is defendant's motion for summary judgment.
For the reasons explained below we grant defendant's motion.

## <u>BACKGROUND</u>

Plaintiff Greenwich Industries, L.P., d/b/a Clarin ("Clarin"),
manufactures and sells folding chairs. (Def. Stmt. of Undisputed
Material Facts (hereinafter, "Def. Stmt.") ¶ 1.) Over a period of
approximately 18 months Clarin purchased foam from the defendant
Leggett & Platt, Inc. ("Leggett") to be used in chair cushions.
(<u>Id.</u> ¶ 8, 38.) Clarin alleges in this lawsuit that, contrary to
Leggett's representations, the purchased foam did not comply with
Clarin's internal density specifications and was not suitable for
seating. (Pl. Stmt. of Add'l Material Facts (hereinafter, "Pl.
Stmt.") ¶¶ 3-4, 9.) Leggett's alleged misrepresentations are
disputed. But even accepting Clarin's version of events, Leggett
argues that it is entitled to summary judgment because it did not

receive notice of its alleged breach within a reasonable time after Clarin should have discovered it.

Leggett first approached Clarin about supplying foam products in 2003. (Id. at ¶ 1; see also Pollard Dep. at 64-70; Altmeyer Dep. at 46-47.) During the period from June 2003 to April 2004 Leggett's sales manager, John Altmeyer, sent price quotes to Clarin's purchasing agent, Cherie Pollard. (Pl.'s Stmt. ¶ 2; Def.'s Stmt. ¶ 4.) At some point during this process Pollard gave Altmeyer seat-cushion drawings indicating dimensions and other product specifications, including density. (Pl.'s Stmt. ¶ 3; see also Clarin Specification Drawings, attached as Ex. 6 to App. to Def.'s Stmt. (indicating a density of 1.75-1.85 lb./cu. ft.).) Clarin contends that this occurred in the spring of 2004, although the witnesses' testimony seems to indicate an earlier date. (Pollard Dep. at 59-61; Altmeyer Dep. at 59-62; Woodbury Dep. at 47-48.) In any case, it is undisputed that Altmeyer received the drawings before he submitted his final quote in April 2004 and that he was aware that Clarin's internal specifications called for a foam density of 1.75-1.85 pounds per cubic foot. (Def.'s Stmt. ¶ 5; Altmeyer Dep. at 62.) The primary fact dispute in this case concerns what Altmeyer told Pollard and her colleague, Thomas Woodbury, about Leggett's ability to supply foam meeting Clarin's density specifications. Altmeyer contends that he told Pollard that Leggett did not sell foam with that density specification.

- 3 -

(Altmeyer Dep. at 63 ("I told them we don't make that foam.").)
Pollard and Woodbury contend that Altmeyer told them that Leggett
could supply foam that met Clarin's "specifications." (Pollard
Dep. at 72 (testifying that Altmeyer told her that Leggett could
supply foam with the "same specifications" as the foam Clarin was
purchasing from its then-current supplier); Woodbury Dep. at 48-49
(testifying that Altmeyer told him that "he could supply the
equivalent of our description — the product we need for our chair.
He could match our specifications."). In her affidavit, Pollard
further states that Altmeyer gave her sample foam with a density of
1.5 pounds per cubic foot — a fact that she presumably learned much
later — and represented that it "was the same as the foam products
that Clarin was using at the time in the seat cushions and backs of
its folding chairs." (Pollard Aff. ¶ 7.)[1]

Leggett does not dispute that beginning in August 2004 it
began selling foam to Clarin with a density below Clarin's
specifications: 1.4-1.6 pounds per cubic foot instead of 1.75-1.85.
(Def.'s Stmt. ¶ 8.) During the period in question, Clarin required
suppliers like Leggett to provide a "certificate of inspection"
with each product shipment indicating the product's

---

[1]  Leggett's specification sheet for the foam that Clarin ordered ("15060
foam") clearly identifies the product's density, but it is unclear whether Clarin
received this sheet before placing its first order. (Def.'s Stmt. ¶ 7;
Specification Sheet, attached as Ex. 7 to App. to Def.'s Stmt.) The April 2004
price quote for the 15060 foam does not identify the product's density
specification. (See April Price Quote, attached as Ex. 8 to App. to Def.'s
Stmt.)

characteristics. (Id. at ¶ 24.) The policy's purpose was to permit Clarin to determine whether the product met Clarin's specifications. (Id. at ¶ 25.) Leggett's certificates — 78 in total over a period of 18 months — all clearly indicate the density specification and the actual density derived from tested samples. (Id. at ¶¶ 28-29; Leggett Certificates of Inspection, attached as Ex. 11 to App. to Def.'s Stmt.) All 78 certificates indicate a density specification of 1.4 to 1.6 pounds per cubic foot and an actual density within that range. (Def.'s Stmt. ¶ 29.) Clarin's failure to recognize the non-compliant foam is baffling, even to Clarin's own employees. (Id. at ¶¶ 34, 36.) Standard operating procedure at the company dictated that someone review the certificates as they arrived with the products and reject any non-compliant foam. (Id. at ¶¶ 27, 32.) If Clarin had followed its own procedures it would not have used any of Leggett's 15060 foam. (Id. at ¶ 35.) Instead, Clarin did not reject any of Leggett's shipments and the foam was incorporated into nearly 175,000 chairs. (Id. at ¶¶ 9, 11.)

No problems have been reported concerning a significant majority of the chairs. (Id. at ¶ 9.) However, Clarin's largest customer, the Church of Jesus Christ of Latter Day Saints (the "Church"), complained in late January 2006 that Clarin's chair cushions were "pancaking," i.e., compressing and not returning to their original form. (Def. Stmt. ¶ 12.) Clarin began shipping

chairs to the Church incorporating Leggett's foam almost one year earlier, in February 2005, by which time Clarin had received approximately 30 certificates of inspection indicating that the cushions did not comply with Clarin's internal specifications. (Id. at ¶ 10; Certificates of Inspection, attached as Ex. 11 to App. to Def.'s Stmt.) Clarin contends that it discovered the non-compliance only after it checked the certificates in response to the Church's complaints. (Pl.'s Stmt. ¶¶ 6-7, 10-12.) In all, Clarin received complaints from between 10 and 15 Church facilities out of approximately 100 facilities that received chairs incorporating Leggett's foam. (Def. Stmt. ¶ 13; Schoenfeld Dep. at 148-49, 183.) Pursuant to Clarin's contract with the Church, however, Clarin was required to replace all of the chairs sent to the Church containing Leggett's foam (approximately 46,000 in all) because they did not comply with Clarin's foam-density specifications. (Def. Stmt. ¶ 17.) Clarin estimates the total cost to replace the cushions at approximately $750,000. (Am. Compl. ¶ 15.)

## DISCUSSION

### A. Legal Standard

Summary judgment "should be rendered if the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." Fed. R. Civ.

P. 56(c). In considering such a motion, the court construes the evidence and all inferences that reasonably can be drawn therefrom in the light most favorable to the nonmoving party. See <u>Pitasi v. Gartner Group, Inc.</u>, 184 F.3d 709, 714 (7th Cir. 1999). "Summary judgment should be denied if the dispute is 'genuine': 'if the evidence is such that a reasonable jury could return a verdict for the nonmoving party.'" <u>Talanda v. KFC Nat'l Mgmt. Co.</u>, 140 F.3d 1090, 1095 (7th Cir. 1998) (quoting <u>Anderson v. Liberty Lobby, Inc.</u>, 477 U.S. 242, 248 (1986)). The court will enter summary judgment against a party who does not "come forward with evidence that would reasonably permit the finder of fact to find in [its] favor on a material question." <u>McGrath v. Gillis</u>, 44 F.3d 567, 569 (7th Cir. 1995).

**B.   Whether Clarin has Timely Revoked its Acceptance**

The parties agree that the Uniform Commercial Code, as adopted by Illinois, governs their dispute. Clarin admits that it accepted Leggett's foam shipments, thereby precluding rejection. 810 ILCS § 5/2-607 ("Acceptance of goods by the buyer precludes rejection of the goods accepted . . . ."). It now contends that it revoked its acceptance pursuant to § 5/2-608, which provides in pertinent part:

> (1) The buyer may revoke his acceptance of a lot or commercial unit whose non-conformity substantially impairs its value to him if he has accepted it
>
> [. . . ]
>
> (b) without discovery of such non-conformity if his acceptance was reasonably induced either by the

difficulty of discovery before acceptance or by the seller's assurances.

(2) Revocation of acceptance must occur within a reasonable time after the buyer discovers or should have discovered the ground for it and before any substantial change in condition of the goods which is not caused by their own defects. It is not effective until the buyer notifies the seller of it.

810 ILCS § 5/2-608. As Leggett points out, since it filed this lawsuit Clarin has consistently pursued damages for breach of warranty and contract without ever discussing revocation. (See Am. Compl. at 3-6.) Indeed, it is not clear whether Clarin is really pursuing "the right to return the disputed goods in toto" or that it would be entitled to substantially different relief if it were successful. See Quaker Alloy Casting Co. v. Gulfco Indus., Inc., 686 F.Supp. 1319, 1335-36 (N.D. Ill. 1988) ("Were Gulfco successful in proving [that] the Casting parts are effectively useless because of the asserted defects, its damages under a warranty theory would be no different from its being entitled to return the goods for a complete refund."). In any case, the record does not support Clarin's assertion that it revoked its acceptance in January 2006. (Pl.'s Opp'n at 3.) The statement of fact that they cite for this proposition states only that on January 30, 2006 Clarin "learned for the first time . . . that there were problems with the foam supplied by Leggett & Platt." (Pl.'s Stmt. ¶ 10.) The deposition testimony supporting this statement likewise says nothing about revocation. (See Schoenfeld Dep. at 85 (testifying that Clarin

notified Leggett about a problem with the foam shortly after the Church's first complaint).) Notifying Leggett that there was a problem with the foam is not notice of revocation. It appears that Clarin raised the matter for the first time in response to defendant's motion for summary judgment, by which time Clarin had disposed of a significant percentage of the non-compliant foam. Revocation is no longer an option as to that foam — throwing goods away certainly qualifies as a "substantial change" in their condition — and Clarin's apparent attempt to revoke acceptance as to the remaining foam is untimely. Clarin should have discovered the grounds for revocation shortly after it received the first shipment of non-compliant foam in August or September 2004. (Def.'s Stmt. ¶¶ 29-38.) We conclude, as a matter of law, that notice of revocation in court papers filed more than four years after the first shipment of plainly non-conforming goods is not notice "within a reasonable time." See Quaker Alloy, 686 F.Supp. at 1335-36 ("[A]ny claimed notice of rejection or revocation via Gulfco's pleadings would be insufficient as a matter of law."). Accordingly, Clarin is limited to its claim for damages stemming from the non-conformity and may not revoke its acceptance. Id.

## C. Whether Clarin Timely Notified Leggett of the Breach

Leggett contends that Clarin is barred from any remedy for breach of warranty or contract because it did not notify Leggett within a reasonable time after it discovered or should have

discovered the breach. See 810 ILCS 5/2-607(3)(a) ("Where a tender has been accepted . . . the buyer must within a reasonable time after he discovers or should have discovered any breach notify the seller of breach or be barred from any remedy.").[2] "As the UCC § 2-607(3)(a) statement of a 'reasonableness' standard suggests, the timeliness (like the adequacy) of notice is a question of fact normally left to the ultimate factfinder. Summary judgment on that issue is appropriate only when the sole reasonable inference is that the notice was unreasonably tardy." Quaker Alloy, 686 F.Supp. at 1337-38 (internal citations omitted). Notice of breach is an "essential element of the plaintiff's case, and accordingly one on which the plaintiff bears the burden of proof." Hays v. General Elec. Co., 151 F.Supp.2d 1001, 1010 (N.D. Ill. 2001).

"In general, buyers . . . must directly notify the seller of the troublesome nature of the transaction or be barred from recovery for breach of warranty." Connick v. Suzuki Motor Co., Ltd., 675 N.E.2d 584, 589 (Ill. 1996). Illinois recognizes an exception, however, where the seller has actual knowledge of the breach. See id. This doctrine has largely been confined to situations where the buyer alerts the seller (short of formal notice) that there is a problem with the goods and/or the seller

---

[2] Section 2-607 refers to "any breach" without differentiating warranty and contract claims. The cases the parties cite mostly refer to breach of warranty, but Clarin does not dispute Leggett's argument that § 2-607 applies to both types of claims. See, e.g., Barliant v. Follett Corp., 384 N.E.2d 316, 322 (Ill. 1978) (assuming without discussion that 2-607 required the buyer to give the seller notice of breach of contract within a reasonable time).

witnesses the problem itself.  See Arcor, Inc. v. Textron, Inc.,
960 F.2d 710, 711 (7th Cir. 1992) (seller made approximately 30
service calls over a two year period to repair a machine it sold to
the plaintiff before the plaintiff sued for breach of warranty);
Malway v. Richards Mfg. Co., 501 N.E.2d 376, 384 (Ill. App. 1986)
(hospital which sold a defective bone plate to the plaintiff had
actual notice of the breach when it removed the broken plate from
the plaintiff); Crest Container Corp. v. R.H. Bishop Co., 445
N.E.2d 19, 25-26 (Ill. App. 1982) (defendant's employee inspected
the malfunctioning product); Overland Bond & Investment Corp. v.
Howard, 292 N.E.2d 168, 176 (Ill. App. 1972) (plaintiff had
defective car towed to the defendant's place of business and
informed the defendant's employees that it needed a "major
repair").  Whether the defendant has received actual notice is also
a question of fact, but one which the court may decide as a matter
of law if no reasonable jury could conclude that notice was
sufficient.  See Hays, 151 F.Supp.2d at 1011 (concluding as a
matter of law that under the totality of the circumstances a repair
report was insufficient to provide actual notice).

   1.  *Whether Leggett had actual knowledge of the breach.*

   Clarin contends that Leggett had actual knowledge of the
breach because, accepting Pollard's and Woodbury's testimony,
Leggett knew that its foam did not comply with Clarin's
specifications but represented otherwise.  It was due to this non-

compliance, not the foam's failure to perform the "same as" the foam provided by Clarin's previous supplier, that the Church demanded that Clarin replace all the cushions. (Def.'s Stmt. ¶ 18.) Clarin relies chiefly on our Court of Appeals' decision in Arcor. In that case, the seller sold the purchaser a machine that did not perform according to the purchaser's specifications. Arcor, 960 F.2d at 711. In the two years after installation the defendants made approximately 30 service calls to attempt to correct the problems. Id. A jury found in the plaintiff's favor and the defendant moved for judgment notwithstanding the verdict based in part on its contention that it did not receive notice of breach with respect to one specific contract requirement. Id. at 712. The defendants themselves alerted the plaintiff to the issue approximately two months after installing the machine, but the defendants contended that the plaintiff did not notify them that it "considered this problem to constitute a breach of the implied warranty." Id. at 715. The Arcor Court concluded that the notice requirement was satisfied because (i) the plaintiff was only required to notify the defendant that it believed the transaction was "troublesome," and (ii) the "defendants clearly had actual knowledge that the Japax machine had failed to conform to one of Arcor's requirements as specified in Arcor's purchase order." Id.

The facts of this case are clearly distinguishable from Arcor. The defendants in Arcor were aware that the machine did not comply

with the purchase order's specifications *and* aware that the plaintiff found the transaction "troublesome" as evidenced by the numerous service calls to repair the machine.  <u>See</u> <u>Perona v. Volkswagen of America, Inc.</u>, 684 N.E.2d 859, 863 (Ill. App. 1997) ("The purpose of the notice is to allow the defendant an opportunity to gather evidence, investigate facts, and negotiate a possible settlement.").  Indeed, the Court concluded that even if the defendants prevailed on the notice issue with respect to one specific problem, they had not identified what damages (if any) stemmed from that problem as distinct from the other problems with the machine.  <u>Arcor</u>, 960 F.2d at 715.  In this case, by contrast, Clarin repeatedly accepted plainly non-compliant goods without objecting until 18 months after the first shipment.  <u>See</u> <u>Aqualon Co. v. MAC Equipment, Inc.</u>, 149 F.3d 262, 267 (4th Cir. 1998) (approving <u>Arcor</u>'s reasoning, but concluding that its "holding does not apply to the present situation, in which the buyer made no complaints after accepting the seller's tender"); <u>see also</u> <u>Connick</u>, 675 N.E.2d at 586 ("The notice 'of the breach' required is not of the facts, which the seller presumably knows quite as well as, if not better than, the buyer, but of the buyer's claim that they constitute a breach.") (quoting <u>American Mfg. Co. v. U.S. Shipping Board Emergency Fleet Corp.</u>, 7 F.2d 565, 566 (2d Cir. 1925)).  This case might be different if Leggett provided the certificates on its own initiative without notifying Clarin, or there was some evidence

that they were disguised in some way to avoid detection. In fact, they were provided pursuant to Clarin's supplier policy and were easily accessible to Clarin when it finally decided to review them properly. (Def.'s Stmt. ¶¶ 24-25, 30, 37.) Clarin's act of repeatedly accepting plainly non-compliant goods "dissipated" whatever notice Leggett may have had that Clarin considered the lower-density foam a breach of warranty and/or contract. <u>Aqualon</u>, 149 F.3d at 268 ("Aqualon's acceptance of the valves without comment after the six months of letters dissipated the effect of its earlier complaints."). Even viewing the evidence in the light most favorable to Clarin, we conclude as a matter of law that the parties' pre-acceptance discussions were inadequate to provide actual notice of breach.

    2. *Whether Clarin's delay in providing notice was unreasonable as a matter of law.*

Leggett had no notice that Clarin considered the transaction "troublesome" until January or February 2006, approximately 18 months after Clarin should have discovered that Leggett's product did not comply with Clarin's density specifications. (Pl.'s Resp. to Def.'s Stmt. ¶¶ 29-38); <u>see, e.g.</u>, <u>Branden v. Gerbie</u>, 379 N.E.2d 7, 9 (Ill. App. 1978) (concluding that a 15-month delay was unreasonable as a matter of law); <u>Wilke Metal Prod., Inc. v. David Architectural Metals, Inc.</u>, 236 N.E.2d 303, 306 (Ill. App. 1968) (applying the precursor to § 2-607: six-month delay unreasonable where plaintiff failed to inspect goods to confirm that they

complied with contract.). Clarin argues at several points in its brief that it did not consult, or was not required to consult, the inspection certificates because it was relying on Altmeyer's representations. (Pl.'s Resp. at 6 (Altmeyer's representations "obviated the need" to consult the inspection certificates); <u>see also id.</u> at 5 ("In 2004 and 2005, Clarin had no reason to believe that Altmeyer (Leggett) would ship something different than what he had promised.").) We think that Clarin is conflating two separate and distinct issues. If Clarin's version of Altmeyer's representations were correct it would tend to show that Clarin's purchasing agent was persuaded to place an order with Leggett in reliance upon false or mistaken respresentations. (<u>See</u> Pollard Aff. ¶ 12 ("I would not have agreed to purchase L&P Foam if L&P's representatives had not represented to me that this foam was the same as the foam products that Clarin was using prior to and through early-June 2004 and that it would perform in the same manner as these foam products."). Section 2-607(3)(a), by contrast, concerns when the buyer should have discovered the breach *after* accepting the goods. <u>See</u> 810 ILCS 5/2-607(3)(a) ("Where a tender has been accepted . . .."). Clarin's admissions in response to Leggett's statements of fact establish that Clarin should have discovered the breach shortly after the first shipment from Leggett. (<u>See</u> Pl.'s Resp. to Def.'s Stmt. ¶¶ 24-38.) Conceivably, a seller's pre-acceptance representations could have some bearing

on the notice question.  However, there is no evidence in this case
that Clarin refrained from reviewing the inspection certificates
because it was relying on Altmeyer's alleged assurance that
Leggett's 15060 foam would meet Clarin's specifications.  On the
contrary, an employee in Clarin's quality-control department,
Alejandro O'Campo, *did* review the certificates.  (O'Campo Dep. at
49-55.)  Mr. O'Campo testified that he knew what Clarin's
specifications were in 2004, knew that Leggett's foam was non-
compliant, and notified his superior about the problem.  (<u>Id.</u> at
24, 53-54.)  Moreover, he could feel the difference between
Leggett's foam and the foam Clarin had been using.  (<u>Id.</u> at 54.)
He later appeared to contradict this testimony when he said that he
saw the certificates but did not see the numbers printed clearly on
the front, set off from the text in a chart, and that the numbers
would not have meant anything to him if he had seen them.  (<u>Id.</u> at
73-74; <u>cf. id.</u> at 24 (testifying that he knew *in 2004* that Clarin
required foam density of 1.75-1.85).)  Be that as it may, no
version of Mr. O'Campo's testimony supports the proposition that he
or anyone else at Clarin ignored the inspection certificates
because they were relying on Altmeyer's word.

If Clarin had adhered to its own policy at any time before
February 2005 it would not have shipped any chairs containing
Leggett's foam to the Church and would not have incurred any of the
damages it seeks to recover in this lawsuit.  By the time that

Clarin notified Leggett, Clarin had shipped approximately 46,000 chairs to the Church. What had been a small problem grew into a very large problem before Leggett had notice and an opportunity to investigate and address the problem. See Pace American, Inc. v. Elixir Industries, No. 06 C 4661, 2009 WL 211953, *5 (N.D. Ill. Jan. 27, 2009) ("[A] principal purpose underlying the obligation . . . to make a seller aware within a reasonable time that its goods do not conform, is to prepare the ground for working out a commercial dispute through compromise.") (quoting P & F Constr. Corp. v. Friend Lumber Corp. of Medford, 575 N.E.2d 61, 63 (Mass. App. 1991)). Under these circumstances, we conclude that the 18-month delay in this case was unreasonable as a matter of law. Accordingly, § 2-607 bars Clarin from any remedy for breach of warranty or contract.[3]

## CONCLUSION

There is no genuine dispute of material fact. Defendant's motion for summary judgment (39) is granted.

DATE:     June 11, 2009

ENTER:    _____

          John F. Grady, United States District Judge

---

[3] Because we conclude that Clarin is barred from any remedy, we need not address Leggett's alternative argument that Clarin's damages were caused by its own negligence and not Leggett's alleged representations.